THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JULIÁN OTERO ET AL., Defendants and Appellants.

No. 11990. Argued May 2, 1947.—Decided June 4, 1947.

---

[4] See amendment enacted by Act No. 138 of May 9, 1945, pp. 467, 475.

*José L. Feliú Pesquera* for appellant Otero. *Luis Negrón Fernández, Attorney General,* and *Joaquín Correa Suárez, Assistant Prosecuting Attorney,* for appellee.

Mr. CHIEF JUSTICE TRAVIESO delivered the opinion of the Court.

Julián Otero and Alberto Navedo were prosecuted in the District Court of Bayamón for the crime of murder and they asked for separate trials. Upon Julián Otero being tried, the

jury found him guilty of murder in the first degree. The lower court, after denying a motion for a new trial, sentenced him to life imprisonment on the charge of murder and to six months in jail on the charge of carrying a weapon. From both judgments the defendant has taken the present appeal, which he bases on four assignments of error.

 The appellant urges that the lower court committed a prejudicial error in permitting the district attorney to read to the jury the confession made by the defendant before the committing magistrate, without first presenting proof to the jury that the confession had been made voluntarily. Let us examine the record:

Pedro Marrero, the first witness for the prosecution, stated in brief that on the night of the occurrence, while a dance was being held in his house, there was a quarrel between Tomás Figueroa and Federico Otero; that Figueroa ran out of the house and Julián Otero and Alberto Navedo, the defendants, went after him, by a road between cane fields; that the witness followed them; that when they arrived at the place where the road connects with the highway, upon Figueroa reaching the bridge, defendant Julián Otero stabbed the former on the back with a dagger; that when Figueroa started to run, Otero ran after him, shouting to Navedo "Grab him, 'Cabo,' he is going that way"; that the witness continued following them and when he arrived he found Figueroa lying on the ground, wounded, moaning, and then dead; that he saw each of the defendants holding a dagger in his hand.

Enrique Rodríguez testified that about 12:30 in the evening he heard a noise made by a crowd of people passing over the road and shortly afterwards the cries of a person who was groaning; that a few moments later he heard some persons running and one of them saying " 'Cabo,' wait for me"; that the witness came out by the front of the house and went to the place where he had heard the moans and there

found Tomás Figueroa wounded and dying; that next day Felipe Santiago Rodríguez in passing by that place found the dagger and gave it to the witness, who delivered it to the police.

The witness Rafael Molina González, Chief of the Insular Police at Vega Baja, testified that when he learned of the occurrence he went to the place where the body of Tomás Figueroa lay; that he searched the body and found no weapon; that he arrested Julián Otero and Alberto Navedo and took them to police headquarters; that while he was making the investigation, the defendant Julián Otero, "voluntarily, without any protest, without inducement of any sort, and without receiving any promise," stated to him the following:

"A. . . . That he was at the house of an uncle of his, named Pedro Marrero; that there was a dance in that house; that while they were dancing Tomás Figueroa had an argument, a quarrel, with another individual named Federico Otero; that upon seeing Tomás Figueroa strike Federico Otero he tried to intervene. That Tomás went out of the house, went away from the dance; that the witness and one Alberto Navedo went after Tomás Figueroa, and Pedro Marrero followed them . . ." (Tr. of Ev., p. 49)

Upon an objection of the defense being overruled, the witness continued testifying thus:

"A. . . . Then he told me that he, Julián Otero, and the other one, Alberto Navedo, went in pursuit of this individual Tomás Figueroa; that they walked fast for about a quarter of an hour; that they went along a road between two cane fields; that then Navedo took a short cut to come out ahead of Tomás Figueroa and he followed behind Tomás Figueroa. That while Tomás Figueroa was running in front of him, he (Julián Otero) using a small knife which he had borrowed from one Eugenio, stabbed Tomás Figueroa on the back; that the knife broke. That when Tomás Figueroa continued to run towards the place where Alberto Navedo was, he (Julián Otero) shouted 'Stop him, 'Cabo'; 'stop him, 'Cabo.' '' That afterwards, upon Tomás Figueroa meeting Alberto Navedo, Alberto Navedo struck Tomás Figueroa with a knife wounding him,

Figueroa falling to the ground on his back, holding a flash light in his hand. That later he met Pedro Marrero, his uncle, when the latter arrived at the place of the occurrence. That is what Julián Otero told me and afterwards Julián Otero ratified the whole of it in the presence of the then Municipal Judge of Vega Baja, Attorney Felipe Marchand, on the day following the occurrence, that is, on the same day on which I went to the ward of 'Ceiba Sabana,' Vega Baja, to the house of Mr. Rodríguez, an overseer of the central.

"The same thing was ratified by this young man before the Municipal Judge of Vega Baja, in the Municipal Court of Vega Baja." (Tr. of Ev., pp. 49–51.)

The witness ended by saying that he took the defendant before the municipal judge and that he told the judge: "Look, Judge, this man stated before me that he killed that boy Tomás Figueroa. This man has knowledge of the facts."

The district attorney then announced that he was going to introduce the sworn confession of Julián Otero taken before the Municipal Judge of Vega Baja on the day following the occurrence; and asked that the jury be withdrawn "in order that the court, after hearing the committing magistrate, may pass upon its admissibility." Immediately thereafter, and as it was then 12:30 P.M., the court ordered a recess in order that the jury might be taken to lunch. At the commencement of the afternoon session, the parties agreed that the jury was the same and that it was complete; and thereupon the Committing Magistrate, Mr. Marchand, testified before the jury, in brief, as follows:

That he took the two defendants and Pedro Marrero, owner of the house, into the courtroom; that after Marrero, in the presence of the two defendants, had stated all that he knew, defendant Julián Otero said to the committing magistrate: "Well, I want to testify also" and that the witness answered "I am delighted, go ahead and testify"; that then Otero testified and his statement was taken down in writing, but before the confession of the defendant was taken down, the magistrate stated to him "that if he testified he might incriminate himself, that he was accused, and that his testi-

mony could be used against him.'' The municipal judge went on to testify regarding all the steps taken by him in connection with the investigation of the case, and at the close of his testimony the district attorney asked that the jury be withdrawn. After the jury had withdrawn, the district attorney announced that, before offering in evidence the confession made by the defendant, he wished to introduce the testimony of Municipal Judge Marchand regarding the voluntary character of the confession.

Judge Marchand stated that before Julián Otero made his statement the judge warned him according to law: ''that he had the right to make a statement or to remain silent'' and ''that if he made any statement he should do so voluntarily''; that he made no promise or inducement of any kind to the accused; that no one threatened or struck him, or made any offer whatsoever to him; that after receiving those warnings the accused insisted on making the statement which the judge took down; that the signature appearing at the foot of the statement is the signature of the accused, and that the latter signed the statement after reading it by himself.

The defense then offered the testimony of the defendant for the sole purpose of impeaching the testimony of Judge Marchand as to the voluntary character of the confession. The defendant testified that at no time was any warning given to him that if he made a statement the same might be used against him; that the police struck him in the street; that it was policeman Olivieri who hit him on the forehead and pushed him from behind; that he did not read the statement but signed it; that they did not tell him to read the statement; that they told him ''sign here'' and he signed it; that he was coerced to signing that statement; that he was crazy with fear because he had never been mixed in any matter like that; that the municipal judge neither struck nor threatened him but shouted at him.

The court decided to admit the confession, the defense took an exception, and the jury returned to the courtroom. The prosecutting attorney asked leave to read out the confession to the jury, the defense objected ''on the ground that said statement had not been voluntarily made in accordance, with the evidence presented to the judge,'' and the court authorized the district attorney to read the statement, whereupon the defense took an exception.

The statement read to the jury is as follows:

''At Vega Baja, Puerto Rico, this 4th day of November, 1945, before this court appears JULIÁN OTERO APONTE, a negro, of legal age, single and resident of the ward of Ceiba, at the place called Pueblo Nuevo, Vega Baja, Puerto Rico, and being duly sworn deposes and says:

''That my name is as aforesaid and my personal circumstances are those stated above.

''That after being warned of my right to remain silent as the present statement might be used against me, and without the intervention of any threat, violence, intimidation or offer of any kind, I insist upon making a statement and freely state as follows:

''That on Saturday, November 3, 1945, I was at a dance in the house of my uncle Pedro Marrero which is located in a place called Pueblo Nuevo in the ward of Ceiba, Vega Baja, and while my cousin Federico Otero was dancing with a girl, Tomás Figueroa struck him and tore his shirt. That when I saw Tomás strike my cousin Federico I tried to intervene. That Tomás Figueroa then ran away and I went after him. That I was followed by my uncle Pedro Marrero and Alberto Navedo came also after Tomás Figueroa. That we ran across the highway and went along a road lying between two cane fields where Enrique Rodríguez lives. That as Tomás Figueroa passed by me I struck him with a small knife. That Tomás Figueroa went on running although I felt that my small knife had hit his body, until he met Alberto Navedo who was standing on the other side of a small bridge in the road. That while Tomás Figueroa was running towards the place where Alberto was, I shouted to Alberto, 'Grab him, 'Cabo,' he is running' meaning Tomás Figueroa. That when Tomás faced Alberto, Alberto attacked him and struck him with a knife which he had in his hand and with which he was waiting for him. That when Alberto attacked Tomás with the knife Tomás fell backwards and lay on his back on the ground holding a flash light

in his hand. That when Tomás fell to the ground my uncle Pedro Marrero and myself arrived at the place. That Tomás Figueroa was lying on the ground and saying 'Please, Berto, don't kill me.' That my uncle Pedro Marrero lighted up the place with a torch and I could see Tomás Figueroa very clearly and upon withdrawing from the place I remember that my uncle Pedro Marrero told us to leave Tomás alone, that we had killed him, and Alberto answered, 'Let that dog go to h. . ., he is already dead.'

"Judge. Q.—Did you see Tomás holding a weapon while you attacked him?

"Witness: A.—No. I did not see any.

"Judge: Q.—Did you hear some dogs bark around the place of the occurrence?

"Witness: A.—Yes, I heard some dogs barking.

"Judge: Q.—That knife with which you attacked Tomás, where did you get it?

"Witness: A.—I borrowed that small knife from my cousin Geño Marrero and Geño loaned it to me on Saturday, November 3, 1945, at dusk.

"Judge: Q.—Do you remember whether that small knife which was loaned to you by Geño broke at any time?

"Witness: A.—Yes, when I struck Tomás Figueroa with the small knife as he passed along my side, I noticed that the small knife hit his body and then it broke, the blade of the small knife falling to the ground and the handle staying in my hand.

"Judge: Q. Did you show the handle of the small knife to anyone?

"Witness: A.—Yes, I showed it to my uncle Pedro Marrero and I told him that the knife had broken when I struck Tomás Figueroa and that it belonged to Geño.

"Judge: Q.—This dagger blade that I am showing you, have you seen it before?

"Witness: A.—Yes, that blade is the blade of a small knife which was loaned to me by my cousin Geño and with which I struck Tomás Figueroa.

"Judge: Q.—Why did you attack Tomás Figueroa with that small knife?

"Witness: A.—I attacked Tomás with the small knife because he had insulted my cousin Federico at the dance and had torn his shirt."

The defense offered no evidence and the case was submitted upon the evidence of the prosecution.

The appellant complains of the court having permitted the district attorney to read out the confession of the accused in the presence of the jury, "without any evidence having been submitted to the jury on the supposed voluntary character of the confession." And in support of his contention he cites our decisions in *People* v. *Dones,* 56 P.R.R. 201, and *People* v. *Declet,* 65 P.R.R. 22, 25.

In *People* v. *Dones, supra,* we held that "Where the statements from the defendant submitted in evidence amount to a confession of guilt, the burden is on the district attorney to show first that the confession was made voluntarily and not under promises or threats" and that "Where the statements of the defendant do not amount to a confession but to an admission, the district attorney is not bound to prove in advance their voluntary character."

In *People* v. *Declet, supra,* the only evidence introduced by the district attorney in order to connect the defendant with the commission of the crime was an extrajudicial confession made by the accused. When the district attorney started to prove the confession, the defense objected to its submission unless the voluntary character of the statement made by the accused was proved. The lower court admitted the confession without previously determining whether it was really admissible. In reversing the judgment and remanding the case for a new trial this Court, speaking through Mr. Justice De Jesús, said:

"As we have already said, in order that an extrajudicial confession be admissible, its voluntary character must be proved. The evidence of the confession consists of two stages. The first one concerns the judge exclusively. When the confession is offered in evidence, the judge should hear the evidence tending to show whether or not the confession was voluntary. The best practice is to accomplish this in the absence of the jury. If the judge decides, as a matter of law, that there is sufficient evidence to go to the jury on the question

of the voluntariness of the confession, he shall call the jury, if the latter has been withdrawn, and then the jury will hear the evidence as to the confession, it being the province of the jury to determine then, as a question of fact, whether or not it was voluntarily given. If in its opinion it was not voluntary, it should disregard it. (Citing authorities.) The burden of proof as to the voluntary character of the confession, as a question of fact, is on the government.''

A confession made before a municipal judge in the course of a preliminary inquiry is extrajudicial in character. Wharton, Criminal Evidence (11th ed., 1935) § 586, p. 967; *The People* v. *Kent,* 10 P.R.R. 325.

It is a doctrine established by numerous decisions that before an extrajudicial confession can be admitted in evidence the prosecuting attorney must prove that it was made voluntarily. *People* v. *Declet, supra,* 3 Wigmore, Evidence (3rd ed., 1940) § 860, p. 342, Annotations in 102 A.L.R. 605.

Appellant's contentions that the district attorney read the confession to the jury ''without any evidence having been submitted to the jury as to the voluntary character of the confession'' and that ''the jury had not before it any evidence on the supposed voluntary character of the confession which was admitted in evidence'' are not supported by the record. The first statement of Committing Magistrate Marchand was made before the jury. Without any objection on the part of the defendant, Judge Marchand testified that, after hearing the statement of the witness Pedro Marrero, the accused told the judge that he also wished to make a statement; that before taking the statement of the accused, the judge gave him the proper warning, telling him that if he made a statement he might incriminate himself and that the statement might be used against him. The testimony given by Judge Marchand before the court, in the absence of the jury, was practically a repetition of the one which he had already given before the jury and which tended to show that the confession had been made by the accused voluntarily. After hearing the testimony of the defendant to the effect that the confession

had not been made voluntarily, it was incumbent on the court to determine whether there was sufficient evidence to justify the submission to the jury of the question as to the voluntary character of the confession. The court, in the absence of the jury, decided that there was. It is true that the district attorney did not follow strictly the rule laid down in the *Declet* case introducing first before the court, in the absence of the jury, and then before the latter, the evidence regarding the voluntary character of the confession. Nevertheless, that deviation from the proper procedure did not prejudice the defendant in any way. See *People* v. *Ortiz,* 42 P.R.R. 130, and Annotations in 148 A.L.R. 546 and 102 A.L.R. 625. The court having decided, as a preliminary question, that the confession was admissible, it was not necessary to recall the committing magistrate in order that the latter might repeat before the jury what he had previously stated regarding the voluntary character of the confession. When the district attorney asked leave to read out the confession to the jury, the defendant merely stated his objection "on the ground that said statement had not been voluntarily made according to the evidence which had been presented to the judge." The defendant could and should have offered at that time for submission to the jury, any evidence he might have to controvert that of the district attorney. Neither the district attorney nor the court could call the defendant to the stand, as the latter had the right to refrain from testifying. The defendant had another opportunity to present to the jury his testimony as to the voluntary character of the confession when the district attorney, after the confession had been admitted, closed his evidence. He not only failed to take advantage of it but announced that he was not going to introduce any evidence, and that he submitted the case on the evidence of the government. Having failed to exercise his right to introduce evidence, the appellant can not now complain that the jury heard only the evidence showing the voluntary character of his confession.

■■ It is urged in the second assignment that the lower court committed prejudicial error in refusing to give part of the additional instructions requested by the defense.

The transcript of the instructions delivered by the court to the jury shows that when the judge started to instruct the jury on the confession admitted in evidence, the attorney for the defendant interrupted him saying: "If the court please, we wish to state that we have submitted a document requesting a special instruction." The court went on to instruct the jury on the confession and ended by saying: "The court will grant a part of this instruction submitted by the defense . . ." The defense then took an exception and the judge went on saying:

"The court instructs the jury that in order that the extrajudicial confession may be admissible, it is necessary to prove that it was made voluntarily."

The appellant does not complain because of the giving of the above-quoted instruction to the jury but because of the failure to give that portion which he alleges was refused by the court. The appellant has not placed us in a position to determine whether the lower court committed the error charged against it. We fail to find anywhere in the record a copy of the document submitted by the defendant requesting a special instruction. We therefore do not know what was it that the defendant requested and the court refused. The appellant has confined himself to the statement in his brief that "the additional instructions requested by the defense were *almost* a faithful and true copy of the words used by this Honorable Court in the case of *People* v. *Declet.*" The term "almost," which we have italicized above, is an adverb of degree meaning nearly, slightly less than approximately, with slight difference, close upon. It is possible that that slight difference between what this Court said in the

*Declet* case and what was stated in the instruction requested by the defense might be sufficient to warrant the refusal of the instruction.

 The third assignment relates to the order of the court denying a motion for a new trial. The motion was based on the alleged commission of the two errors which we have already discussed. Since those errors were not committed, we must hold that the lower court did not err in refusing to grant a new trial.

We have made a careful study of the evidence and we are of the opinion that it is sufficient to justify the verdict and the two sentences imposed on the defendant.

The judgments appealed from should be affirmed.